852 F.2d 891
 1988-2 Trade Cases 68,150
 STATE OF ILLINOIS ex rel. Neil F. HARTIGAN, Attorney General
of the State of Illinois, in its proprietary capacity, in
its parens patriae capacity, and in its representative
capacity, Plaintiff-Appellee,
v.
PANHANDLE EASTERN PIPE LINE COMPANY, Defendant-Appellant.
 No. 85-2601.
 United States Court of Appeals,
Seventh Circuit.
 Argued Feb. 28, 1986.
Decided Jan. 22, 1988.
Rehearing En Banc May 26, 1988.
Decided July 18, 1988.
 
 Paul H. LaRue, Chadwell & Kayser, Ltd., Chicago, Ill., for defendant-appellant.
 Richard L. Miller, Raymond J. Smith, Burke & Smith, Chtd., Chicago, Ill., for plaintiff-appellee.
 Before BAUER, Chief Judge, CUMMINGS, CUDAHY, POSNER, COFFEY, FLAUM, RIPPLE, MANION, and KANNE, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.*
 POSNER, Circuit Judge.
 
 
 1
 Central Illinois Light Company (CILCO) is a publicly regulated retail distributor of natural gas. It bought natural gas from Panhandle Eastern Pipe Line Company at prices allegedly inflated because of violations of the antitrust laws by Panhandle, and resold the gas to residential and industrial consumers. In its resales to residential consumers, CILCO passed on the entire overcharge in the form of higher rates. In 1984 the State of Illinois brought this federal antitrust suit on behalf of CILCO's customers against Panhandle--which moved to dismiss the suit as barred by the "indirect purchasers" rule of Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), and Illinois Brick Co. v. Illinois, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). The district court denied the motion, but certified its order of dismissal for an immediate appeal under 28 U.S.C. Sec. 1292(b), and we agreed to hear the appeal. A panel of this court reversed the district court and directed it to dismiss the complaint. 839 F.2d 1206 (7th Cir.1988). The full court granted rehearing en banc to decide whether regulatory cost-plus pricing can ever be excepted from the rule that "indirect purchasers" (CILCO's customers are indirect purchasers from Panhandle, CILCO being the direct purchaser) are barred from obtaining antitrust damages from their indirect seller. While the appeal was pending in this court, the district judge conducted a 13-week trial on liability, but he has deferred making a decision until we decide the appeal.
 
 
 2
 In Hanover Shoe the Supreme Court held that it is not a defense to an antitrust damages action that a buyer forced to pay a higher price because of the seller's antitrust violation passed on the cost of the violation to the buyer's customers (the seller's indirect purchasers) by raising his prices to them, unless the buyer had a cost-plus contract with these customers. Illinois Brick announced a corollary to Hanover Shoe: the indirect purchaser cannot sue to recover the part of the overcharge that the buyer passed on to him. The Court again recognized an exception for the cost-plus contract, noting that it insulates the direct purchaser from "any decrease in its sales as a result of attempting to pass on the overcharge, because its customer is committed to buying a fixed quantity regardless of price." Id. at 736, 97 S.Ct. at 2069-70. Fastening on the words "fixed quantity," the panel majority in this case held that the cost-plus exception is never available when the indirect purchasers are free to vary the quantity they buy from the direct purchaser. The question for decision today is whether the exception is as confined as the panel thought.
 
 
 3
 The panel's opinion was not the first to read the exception so narrowly. See Mid-West Paper Products Co. v. Continental Group, Inc., 596 F.2d 573, 577 n. 9, 580 (3d Cir.1979); In re Midwest Milk Monopolization Litigation, 730 F.2d 528, 533 (8th Cir.1984); Lefrak v. Arabian American Oil Co., 487 F.Supp. 808, 819 (E.D.N.Y.1980); cf. Arizona v. Shamrock Foods Co., 729 F.2d 1208, 1212 n. 2 (9th Cir.1984); but see In re Uranium Antitrust Litigation, 552 F.Supp. 518 (N.D.Ill.1982). And its reading was followed in In re Wyoming Tight Sands Antitrust Cases, No. 85-2349-S (D.Kan. May 4, 1988). Yet it was not dictated by precedent. Not only had the prior cases all involved privately negotiated cost-plus contracts rather than cost-plus contractual provisions required by public utility regulation, but there was no reason to believe that the reference to "fixed quantity" in the Supreme Court's opinion in Illinois Brick was intended to govern cases so remote from the actual arrangements under scrutiny in that case. The case did not involve a fixed-quantity contract; indeed, it did not involve a cost-plus contract, but merely an argument (which the Court rejected, see 431 U.S. at 744, 97 S.Ct. at 2074) that a buyer's practice of rule-of-thumb cost-plus pricing should be enough to allow his customers to sue the seller. Certainly there is no indication that by using the words "fixed quantity" the Supreme Court meant to address the issue of the status of regulatory cost-plus pricing. We do a disservice to the Court by wrenching its words out of context and giving them a talismanic significance; we make language a trap rather than a mode of communication. The Supreme Court has never adverted to the issue involved in the present case, and we must consider that issue in relation to the rationale of Illinois Brick rather than to isolated phrases in the Court's opinion. If we are to play the language game to which Panhandle invites us, moreover, then we must consider isolated phrases in other Supreme Court opinions, notably the majority opinion in Blue Shield of Virginia v. McCready, 457 U.S. 465, 474-75, 102 S.Ct. 2540, 2545-46, 73 L.Ed.2d 149 (1982), where the concern behind Hanover Shoe and Illinois Brick is described as "the risk of duplicative recovery engendered by allowing every person along a chain of distribution to claim damages arising from a single transaction that violated the antitrust laws." There is, as we shall see, no such risk in this case, at least so far as the residential purchasers from CILCO are concerned; and it is only they who have, in our view, a persuasive claim to be entitled to sue.
 
 
 4
 Although several district courts have rejected an exception for cost-plus rate regulation, see (besides Tight Sands ) Go-Tane Service Stations, Inc. v. Ashland Oil, Inc., 508 F.Supp. 200, 204 (N.D.Ill.1981); City of Cleveland v. Cleveland Electric, Illuminating Co., 538 F.Supp. 1320, 1323-27 (N.D.Ohio 1980); U.S. Oil Co. v. Koch Refining Co., 518 F.Supp. 957, 962-63 (E.D.Wis.1981), the cases are distinguishable; and in the case with facts most like those of the present case the court held that indirect purchasers could sue because public utility regulation had created "a straight cost passthrough." In re New Mexico Natural Gas Antitrust Litigation, 1982-1 Trade Cases p 64,685, at p. 73,722 (D.N.Mex.1982). Cf. County of Oakland v. City of Detroit, 628 F.Supp. 610, 613 (E.D.Mich.1986); Illinois v. Borg, Inc., 548 F.Supp. 972, 975-76 (N.D.Ill.1982). An additional wrinkle in the New Mexico Natural Gas case, however, was that the direct purchasers were in cahoots with the defendants; this was an independent ground for allowing the indirect purchasers to sue.
 
 
 5
 It is possible to allow indirect purchasers to sue in a case such as the present one without embracing the ill-defined "functional equivalent" approach of In re Beef Industry Antitrust Litigation, 600 F.2d 1148 (5th Cir.1979); see also, e.g., Gulf Oil Corp. v. Dyke, 734 F.2d 797, 809 (T.E.C.A.1984). That approach--effectively criticized in In re Midwest Milk Monopolization Litigation, 529 F.Supp. 1326, 1337-38 (W.D.Mo.1982), aff'd, 730 F.2d 528 (8th Cir.1984); Comment, A Legal and Economic Analysis of the Cost-Plus Contract Exception in Hanover Shoe and Illinois Brick, 47 U.Chi.L.Rev. 743, 756-70 (1980), cf. Abbotts Dairies Division of Fairmont Foods v. Butz, 584 F.2d 12, 16-17 (3d Cir.1978), and found to be inapplicable to conditions in the beef industry itself in In re Beef Industry Antitrust Litigation, 710 F.2d 216, 219-20 (5th Cir.1983)--requires elaborate analysis of the incidence of a cost increase, which is precisely the analysis that the Court disparaged in Illinois Brick. Our approach does not require this. We have formal cost-plus pricing in this case rather than its "functional equivalent." We have formal cost-plus pricing, and more: a contract that required 100 percent passing on, and an acknowledgment of 100 percent passing on in every kilowatt hour resold to CILCO's residential consumers.
 
 
 6
 To determine whether (or to what extent) this case is within the rule of Illinois Brick, we must consider the reasons for confining the right to sue to the direct purchaser; for it is the reasons behind a rule that determine its scope. First, because the direct purchaser is closer to the violation and hence more likely to discover it, we want to make sure that he has a strong incentive to bring the violator to book, and we do this by holding out to him the prospect of recovering the entire damages caused by the violation if he wins the suit. Second, it is difficult to apportion damages between direct and indirect purchasers by the methods of litigation. A direct purchaser who finds himself paying a higher price for inputs would love to pass on all of the additional cost to his customers in the form of a higher price, but he cannot do so, because a price that much higher will so reduce the demand for his product that his profits will fall unacceptably. (If the higher price were optimal, the firm would have raised its price without waiting for its costs to increase.) The optimal adjustment by an unregulated firm to the increased cost of the input will always be a price increase smaller than the increase in input cost, and this means that the increased cost will be divided between the two tiers, the direct and indirect purchasers--but in what proportions will often be hard to determine, even by sophisticated techniques of economic analysis. This is a central insight of the Illinois Brick decision. An additional complication that further demonstrates the wisdom of the decision is that the higher input price may induce the direct purchaser to use more of an alternative input, and this substitution will affect the proportion of the initial overcharge that the direct purchaser can recoup.
 
 
 7
 Where the direct purchaser has a cost-plus contract with his customers that requires them to buy a fixed quantity, the reasons for confining the right to seek damages to the direct purchaser cease to be fully persuasive. There is no longer a problem of apportionment, because the whole of any price increase will have been passed on to the customers by virtue of the contract. Yet the second reason for confining the right to seek damages to the direct purchaser survives: he has better information about the violation. And despite the cost-plus nature of the contract, he has everything to gain from suing. He will not have to share any of the damages that he recovers with his customers unless the contract contains a clause (or a court is persuaded to adopt an imaginative conception of unjust enrichment) that entitles them to any rebate he might receive, probably years later, on an input used in performing his side of the bargain. Nevertheless the Supreme Court has said that the indirect purchaser may sue if he has a cost-plus contract with the direct purchaser.
 
 
 8
 In the present case, where cost-plus pricing is imposed by public utility regulation rather than by a purely private, purely voluntary contract, the reasons balance out slightly differently, but the case for applying the cost-plus exception of Illinois Brick is no weaker once the balance is restruck. The public utility has less to gain from suit than the direct purchaser in the case of the purely private contract. The public utility commission may force the utility to pass on to the consumers any and all damages that the utility recovers, and if it does utilities will have no incentive to sue because they will have nothing to gain from suit. In the present case CILCO finally did sue--but not until 1987, by which time the present suit was far advanced and the statute of limitations with regard to the damages incurred by residential customers in the present suit either had run or was about to run; and the CILCO case has remained dormant pending our decision of the appeal. CILCO seems a most reluctant suitor, and why shouldn't it be? It has little or nothing to gain by such a suit. Indeed, one might argue that public utility regulation (to the extent effective--admittedly a potentially big if) so far identifies a public utility with its customers as to bring the case within the separate exception recognized in Illinois Brick for situations in which the direct and indirect purchaser are under common control. See 431 U.S. at 736 n. 16, 97 S.Ct. at 2070 n. 16.
 
 
 9
 Although the amount of gas purchased by a utility's customers is not fixed in their contract with the utility (it would be absurd for consumers to commit to a fixed quantity; their need for gas varies with the weather!), the special character of a public utility eliminates the problem of apportionment, here with respect to the only class of customers that we believe should be allowed to sue, the residential customers. The retail distribution of natural gas through a grid of pipes to the customers' homes or places of business is a natural monopoly, Omeqa Satellite Products Co. v. City of Indianapolis, 694 F.2d 119, 123, 126 (7th Cir.1982); so, in the absence of regulation, a gas utility would charge a monopoly price. Although the efficacy of public utility rate regulation has been questioned (see, e.g., Stigler & Friedland, What Can Regulators Regulate? The Case of Electricity, 5 J.Law & Econ. 1 (1962); Moore, The Effectiveness of Regulation of Electric Utility Rates, 36 So.Econ.J. 365 (1970)), the facts of this case suggest, and the parties seem to agree, that residential natural-gas rates in Illinois are lower because of regulation than they would be in an unregulated market, implying that CILCO has unused monopoly power in that market, which it exploited by passing on the full overcharge by Panhandle. The situation in the industrial market is different. Some industrial consumers of natural gas have good alternatives, and as to them CILCO apparently had no unused monopoly power that would have enabled it to shift the whole of the cost increase to them. Instead CILCO sought and obtained regulatory permission to reduce its profit margin on sales to these customers, thereby offsetting in part the higher rates enabled by the automatic pass-through provision.
 
 
 10
 CILCO's dealings with its industrial customers show why the absence of a quantity provision in a contract can make a difference. Since the industrial customers were not obligated to take a fixed (or their required) quantity of natural gas, and since they had competitive alternatives, CILCO's profit-maximizing course of action was to swallow part of the overcharge rather than try to pass it on dollar for dollar in the form of higher rates. But its residential consumers unlike its industrial customers had no good alternatives to natural gas (of which CILCO was the sole purveyor), at least in the short term, and CILCO's profit-maximizing course of action was therefore to allow its rates to them to rise by the exact amount that its gas costs rose as a result of Panhandle's alleged overcharge. It was not only the absence of competition but the presence of regulation that made this the profit-maximizing course of action; regulation is a stand-in for the quantity requirement in an ordinary contract. Apparently rate regulation had succeeded in keeping CILCO's rates to a level where an increase in those rates was bound to increase the firm's revenues because the price increase (1) would not be offset by an equal or greater proportional decline in its sales and (2) would lead to a reduction in the firm's total costs (consumers would buy less, even if only a little less, at the higher price). CILCO therefore had every incentive to raise its price by the full amount allowed by the regulatory commission--which was the full amount of the gas overcharge. And it did it.
 
 
 11
 The significance of the regulatory setting is that if regulation keeps a utility's rates below what it would like to charge, the utility will raise those rates by the full amount allowed by the regulatory commission unless such an increase would carry the utility above its optimum rate. An unregulated firm would not do that, since as we have noted an unconstrained profit maximizer will always find it in its best interest to swallow a part of any cost increase that it experiences unless its customers are committed to a fixed quantity. It is unclear from the record in this court how generous the commission's allowance was; the commission may have allowed CILCO to double its rates--yet even so, if regulation forced CILCO to charge half or less of its preferred price, CILCO would pass on the entire cost increase. No one suggests that CILCO in fact absorbed any part of the increase, so far as sales to its residential customers were concerned.
 
 
 12
 The mechanics of the pass-through provision are pertinent. The "Uniform Purchase of Gas Adjustment Clause" that Illinois by statute requires CILCO to include in its contracts not only entitled but directed CILCO, if it paid Panhandle an extra penny per million cubic feet of gas, to add exactly one penny to each customer's bill for every Mcf of gas sold to that customer. So if all of its customers had continued buying the same amount of gas CILCO would have suffered no loss on account of the overcharge. To the extent that CILCO lost residential sales because it was charging a higher price--and no doubt it lost some sales--the loss was not passed on to CILCO's customers (at least in any sufficiently direct way to escape the rule of Illinois Brick ) and hence is not a component of the customers' damages. But by the same token this is not a case where successive links in the chain of distribution are claiming damages in respect of the same transaction. There are, instead, two completely different sets of transactions. One consists of sales to CILCO followed by resale to its residential customers; on these sales the entire overcharge came to rest on the residential customers and they alone suffered damage and can (on the view we take of the case) recover damages. The other set of transactions consists of the sales that CILCO lost because some customers balked at the higher rates; on these sales (or rather nonsales) the only loser is CILCO, and only CILCO can sue. There is no suggestion that the residential customers are suing or could sue to recover incidental expenses incurred by reducing their purchases of natural gas--the cost of an extra sweater or a more efficient furnace or better insulation.
 
 
 13
 To illustrate the distinction between the two types of loss in this case, suppose that the price to CILCO's residential customers before the (alleged) overcharge by Panhandle was $1 per Mcf, the overcharge was 10cents per Mcf, and by operation of the Uniform Purchase of Gas Adjustment Clause the retail price rose to $1.10 because CILCO made no offsetting reduction in another component of the price, as it did with its industrial customers. And suppose that at the new, higher price CILCO sold only 950,000 Mcf, while at the old price it had sold 1,000,000 Mcf, and that nothing plausibly accounts for the decrease in sales except the price increase, which induced consumers to use less gas. Cf. Illinois Power Co. v. Commissioner, 792 F.2d 683, 687-88 (7th Cir.1986). The loss to each consumer would be the number of Mcf he bought at the new price times 10cents; the loss to CILCO would be its lost profits on the sales it did not make.
 
 
 14
 Thus there can be no problem of apportionment in the suit on behalf of the residential customers. Those customers are not seeking damages for gas they did not buy, and the damages for the gas they did buy can simply be read off from their gas bills. (Well, almost: at the beginning of each year the utility estimates the amount of rate increase necessary to cover any increase in its gas bill, and there is an adjustment at the end of the year based on actual experience.) Since CILCO can sue for its lost sales (this may be a component of its belatedly filed suit against Panhandle, although that is unclear from the complaint), there can be more than one set of plaintiffs. But each set will be suing in respect of different sales--not, as in Illinois Brick, the same sales.
 
 
 15
 We have said that proof of the indirect purchasers' loss would be straightforward. Proof of CILCO's lost sales would also be straightforward--at least as straightforward as is possible in an antitrust case. It would be a matter of comparing the utility's sales before and after the increase in gas prices, after correcting for other factors besides the increase that might have affected those sales. Such correction is not always easy, but it is a conventional aspect of calculating damages in antitrust cases; it has to be done in every case where the plaintiff claims to have lost sales because of the defendant's unlawful conduct and the defendant argues that the loss was due partly or entirely to other factors. See, e.g., Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946); Fishman v. Estate of Wirtz, 807 F.2d 520, 551 (7th Cir.1986); id. at 578 (partial dissent); Olympia Equipment Leasing Co. v. Western Union Telegraph Co., 797 F.2d 370, 382-83 (7th Cir.1986). More important, it is a problem unrelated to the problem the Supreme Court wrestled with in Hanover and Illinois Brick. The Court was concerned with the situation where two purchasers of the same thing--the initial purchaser and the purchaser from the initial purchaser--are or could be complaining that both had been hurt, and the problem is to apportion the loss between them. Here only the residential consumers can complain about a loss from the overcharge on the gas they bought, while only CILCO can complain about a loss caused by the overcharge on gas that the residential consumers did not buy.
 
 
 16
 All this is not to say that Illinois Brick has no application to cases where the direct purchaser is subject to rate regulation. Although cost-plus is the spirit of rate regulation, the flesh is weak and often therefore the utility has considerable flexibility in pricing, much like an unregulated firm. Indeed, to the extent that it operates free from effective rate regulation--either because it faces competition which constrains its rates below the regulated level (apparently CILCO's situation with its industrial customers), or because the regulators are unable to prevent it from charging monopoly prices to its captive customers--the utility's situation is identical to that of an unregulated firm. But, if so, this will be revealed in the utility's decision to swallow some of the cost increase, as CILCO did with its industrial customers. In the case of its residential customers, regulation must have succeeded in forcing the utility to operate in a region of its demand curve where 100 percent passing on of any cost increase was the optimal strategy for the utility to follow, for that was the strategy it did follow.
 
 
 17
 With the rapid and unanticipated increases in fuel prices during the 1970s, utilities pressed for and obtained the right to include automatic fuel pass-through provisions in their contracts with customers, provisions that would allow the utility to pass on every dollar in higher prices that it paid for gas or other fuels to its customers without going through the time-consuming process of obtaining regulatory authorization to raise rates. Such provisions are also found in unregulated contracts, and should be treated the same there when the contract requires the buyer to take either a fixed quantity or his requirements, since a buyer cannot reduce his purchases under a requirements contract merely because he is dissatisfied with the terms of the contract as they have worked themselves out. See Empire Gas Corp. v. American Bakeries Co., 840 F.2d 1333, 1340-41 (7th Cir.1988); Wilsonville Concrete Products v. Todd Building Co., 281 Ore. 345, 352, 574 P.2d 1112, 1115 (1978); Royal Paper Box Co. v. E.R. Apt Shoe Co., 290 Mass. 207, 195 N.E. 96 (1935); Fort Wayne Corrugated Paper Co. v. Anchor Hocking Glass Corp., 130 F.2d 471, 473-74 (3d Cir.1942); White & Summers, Handbook of the Law Under the Uniform Commercial Code 126 (2d ed. 1980). (This example shows, by the way, why a rigid test of fixed quantity would be a senseless limitation on the cost-plus exception of Hanover Shoe and Illinois Brick--a buyer under a requirements contract does not have discretion as to the amount to take under the contract.) If on the other hand the buyer has complete flexibility as to how much to buy, a cost-plus provision is ineffectual; the buyer can always condition an agreement to buy a specific amount on the seller's agreeing to modify the contract by reducing the price. This is another reason for supposing that an agreement to take a fixed quantity, or, what is equivalent for these purposes, an agreement to take one's requirements, is implicit in the cost-plus exception rather than an independent requirement for invoking it. The unexhausted monopoly power of a regulated utility takes the place of a fixed-quantity or requirements provision. The utility can force the whole of the cost increase through to its residential customers without sacrificing any profits, and did so.
 
 
 18
 But we do not think that the industrial customers should be allowed to sue for damages. By cutting its profit margin to them CILCO raised its price by less than the increase in gas cost, and while the division of that increase between the utility and its industrial customers is easy to ascertain--precisely because the utility was required to get approval for reducing its profit margin--we are unwilling to complicate the administration of Illinois Brick by trying to distinguish between difficult and easy apportionment cases. And the Supreme Court seemed unwilling to listen to such arguments. But for every cubic foot of gas bought by a residential customer, we know that the whole overcharge was passed on to the customers in accordance with the fuel pass-through provision of their contract with CILCO, and we know why (regulation plus the residential consumers' lack of alternatives).
 
 
 19
 It might seem an unimportant detail whether a buyer reacts to an overcharge by raising its price by less than the overcharge (as CILCO did with its industrial customers), thus losing fewer customers, or by raising its price by the full overcharge and thereby losing more customers than it would if it swallowed part of the overcharge. But in the second case the problem of apportioning losses on the same sales does not arise. It might also seem impermissible under Illinois Brick to inquire into the question whether there really was 100 percent passing on; but the Court announced an exception for cases where there is a cost-plus contract, and there is such a contract here--the automatic fuel pass-through provision. Although it is not a contract for a fixed quantity or (what is equivalent for purposes of the exception) the buyer's requirements, the existence of public utility regulation is an adequate substitute in the circumstances.
 
 
 20
 True, we can never be absolutely certain that regulation has resulted in a 100 percent pass through; for all we know, CILCO would have sought a rate increase but for the gas overcharge, and by forbearing to do so in effect absorbed part of the overcharge. But by the same token, the seller under a fixed-quantity cost-plus contract might forbear to insist on a 100 percent pass through in order to curry favor with the buyer for the sake of future deals. No counterfactuals are certain, but the doubts here are too small to warrant our insisting that this potentially serious antitrust violation, which may have caused consumers of natural gas to pay almost $50 million in higher prices, shall go unremedied, as it may if we accept Panhandle's view of the scope of Illinois Brick. Whether the cost-plus exception might embrace other situations in which the direct purchaser has a cost-plus contract with the indirect purchasers but the contract does not require the indirect purchasers to buy a fixed quantity (or their requirements) is not a question that we need decide in this case.
 
 
 21
 The suit on behalf of the residential customers is within the scope of the cost-plus exception to the rule of Illinois Brick as we understand it, and we therefore affirm the denial by the district court of the defendant's motion to dismiss the complaint insofar as the complaint seeks damages on behalf of CILCO's residential customers. We reverse insofar as the court allowed suit on behalf of the industrial customers for damages. We express no view of the antitrust merits or of the propriety of the requests for injunctive relief, and we award no costs in this court.
 
 
 22
 AFFIRMED IN PART AND REVERSED IN PART.
 
 CUDAHY, Circuit Judge, concurring:
 
 23
 I concur without reservation in the majority's application of the Illinois Brick doctrine to the facts of this case. A bar to indirect purchaser suits would make very little sense if it were extended to the regulated natural gas distribution business where full purchased gas cost pass-through is incorporated in the retail rates. The PGA clause transforms the transaction into the very epitome of a cost-plus contract. Likewise, because residential gas demand is inelastic in the short run due to the unavailability to residential customers of substitute fuels, a rough approximation of a fixed quantity term is present, whether or not required by Illinois Brick.
 
 
 24
 The Natural Gas Pipeline Association of America, in an amicus brief, argues that if the antitrust suit were left to the direct purchaser (CILCO), its regulator (the Illinois Commerce Commission) could and would direct CILCO to pass on the sums recovered to its customers. The customers would, therefore, be in as good a position as if the Attorney General had sued directly on their behalf. I believe this is essentially correct. CILCO has in fact now brought suit in this matter, presumably because the panel decision cast doubt on whether the Attorney General could maintain the action on behalf of consumers.
 
 
 25
 Under the practical facts of regulation CILCO would ordinarily have a greater incentive to bring this litigation than economic theory suggests. An informal suggestion from its regulators that suit was appropriate to protect customers would ordinarily send CILCO to court. Further, regulation allows CILCO to recognize only its prudently incurred expenses for ratemaking purposes. Presumably, a distribution company's purchase of pipeline gas at prices inflated by antitrust violations could be challenged as an imprudent incurrence of operating expenses. An antitrust recovery would at least partially offset any imprudence in the initial purchasing decision. In any event, in its next rate case, the distribution company would be hard pressed to justify its payment of illegally inflated prices if neither it nor the Attorney General had sought to press the antitrust claim.
 
 
 26
 Nonetheless, I suspect that considerations such as the difficulty of settlement might lead CILCO to prefer an Attorney General's lawsuit to its own. Presumably, a settlement by the state Attorney General with the pipeline supplier would be accepted as fully arm's length and justifiable. Were CILCO to settle, however, the aggressiveness of its stance might be questioned by the regulators in light of its ongoing relationship with the supplier and, of course, its settlement would in all probability have to be approved by the regulatory authority. It therefore seems to me that, in the final balance, suit by CILCO is not necessarily preferable to suit by the Attorney General on behalf of the residential customers.
 
 
 27
 FAIRCHILD, Senior Circuit Judge, with whom BAUER, Chief Judge, and CUMMINGS and MANION, Circuit Judges, join, concurring in part, dissenting in part.
 
 
 28
 I concur in reversal as to the treble damage claims on behalf of industrial customers. I respectfully dissent from affirmance with respect to such claims on behalf of residential customers.
 
 
 29
 The residential customers purchase from CILCO, and are only indirect purchasers from Panhandle, who allegedly overcharged CILCO. Because the rates charged by CILCO reflect, approximately at least,[1] the actual cost of gas, it is claimed that the residential customers were "injured" so as to be entitled to treble damages under Sec. 4 of the Clayton Act, 15 U.S.C. Sec. 15,[2] by reason of the pass-on of the overcharge.
 
 
 30
 The Supreme Court has "held that, except in certain limited circumstances, a direct purchaser suing for treble damages under Sec. 4 of the Clayton Act is injured within the meaning of Sec. 4 by the full amount of the overcharge paid by it ...". Illinois Brick Co. v. Illinois, 431 U.S. 720, 724, 97 S.Ct. 2061, 2064, 52 L.Ed.2d 707 (1977) (footnote omitted) (interpreting the rationale of Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481, 494, 88 S.Ct. 2224, 2232, 20 L.Ed.2d 1231 (1968)). Hanover Shoe had rejected an attempt by an antitrust defendant to establish that plaintiff direct buyer had not been "injured" within the meaning of Sec. 4 because the direct buyer had passed on any overcharge. In Illinois Brick, plaintiff was asserting a claim on behalf of indirect purchasers that they had been "injured" by a pass-on of an overcharge. The Court reaffirmed Hanover Shoe and decided that its root principle (that, with limited exceptions, the full injury of the overcharge falls upon the direct purchaser) must apply to and prevent treble damage claims on behalf of an indirect purchaser, as well as apply to and permit claims of a direct purchaser.
 
 
 31
 Both Hanover Shoe and Illinois Brick dealt with the question presented as one of statutory construction of Sec. 4. Indeed in Illinois Brick, the Court said,
 
 
 32
 In considering whether to cut back or abandon the Hanover Shoe rule, we must bear in mind that considerations of stare decisis weigh heavily in the area of statutory construction, where Congress is free to change this Court's interpretation of its legislation.
 
 
 33
 431 U.S. at 736, 97 S.Ct. at 2070.
 
 
 34
 Illinois Brick described only two exceptions to its general rule that the direct purchaser is injured by the full amount of the overcharge. One, "where the direct purchaser is owned or controlled by its customer," 431 U.S. at 736, n. 16, 97 S.Ct. at 2070, n. 16, is clearly inapplicable here. The other, which originated in Hanover Shoe, is where an overcharged direct buyer has a pre-existing cost-plus contract for a fixed quantity. 431 U.S. at 736, 97 S.Ct. at 2069.
 
 
 35
 Judge Posner's opinion for this court suggests that the reference to "a fixed quantity" does not have controlling significance. Ante, pp. 893 and 894. Particular aspects of the Hanover Shoe and Illinois Brick opinions persuade me otherwise.
 
 
 36
 The Hanover Shoe opinion, in recognizing that "a preexisting 'cost-plus' contract" might provide an exception to its rule against a pass-on defense, did not expressly require a fixed quantity element. 392 U.S. at 494, 88 S.Ct. at 2232. That element may well have been implied, for the Court referred to the cost-plus contract as "thus making it easy to prove that [the direct buyer] has not been damaged." Ibid. In Illinois Brick, Justice White, who wrote for the Court in both cases, expressly referred to the fixed quantity element and took pains to explain why it was important:
 
 
 37
 But this Court in Hanover Shoe indicated the narrow scope it intended for any exception to its rule barring pass-on defenses by citing, as the only example of a situation where the defense might be permitted, a pre-existing cost-plus contract. In such a situation, the purchaser is insulated from any decrease in its sales as a result of attempting to pass on the overcharge, because its customer is committed to buying a fixed quantity regardless of price. The effect of the overcharge is essentially determined in advance, without reference to the interaction of supply and demand that complicates the determination in the general case.
 
 
 38
 431 U.S. at 735-36, 97 S.Ct. at 2069-70.
 
 
 39
 This court's opinion concedes that no doubt CILCO lost residential sales because of the higher price, and because of the overcharge if there was one. Ante, p. 896. It follows from Hanover Shoe and Illinois Brick that when some injury falls on the direct purchaser because of the overcharge, it all does.
 
 
 40
 After considering and rejecting proposed exceptions, the Court said "As we have noted, supra at 735-36, [97 S.Ct. at 2069-2070], Hanover Shoe itself implicitly discouraged the creation of exceptions to its rule barring pass-on defenses, and we adhere to the narrow scope of exemption indicated by our decision there." 431 U.S. at 745, 97 S.Ct. at 2074.
 
 
 41
 As I read Illinois Brick, the Supreme Court did not leave it to the discretion of the lower courts to create new exceptions for situations which fall within some range of approximation of the exceptions defined by the Court. And that is what this court appears to be doing with respect to the claims of the residential customers.
 
 
 
 *
 Circuit Judges WOOD, Jr. and EASTERBROOK did not participate in the consideration or decision of this case
 
 
 [1]
 The process of adjustment of rates charged by CILCO to rates paid is described in the panel opinion. 839 F.2d at 1208 n. 2
 
 
 [2]
 Section 4 provides that
 [A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor ... and shall recover threefold the damages by him sustained....