### In re WYOMING TIGHT SANDS ANTITRUST CASES.

**STATE OF KANSAS, as parens patriae on behalf of natural person residing in Kansas, Robert T. Stephan, Attorney General of the State of Kansas,**

**and**

**State of Missouri, Plaintiffs–Appellants,**

**Kansas Power & Light Company, a Kansas Corporation; Kansas Gas & Electric Company, Plaintiffs–Appellees,**

**Utilicorp United Inc., Plaintiff-intervenor-Appellee.**

**v.**

**AMOCO PRODUCTION CO.; Cities Service Oil and Gas Corporation, f/k/a Cities Service Company; CSG Exploration Company; Williams Natural Gas Company, f/k/a Northwest Central Pipeline Corporation; The Wamsutter Limited Partnership; The Moxa Limited Partnership, Defendants–Appellees.**

**Nos. 88–2158, 88–2159.**

United States Court of Appeals, Tenth Circuit.

Jan. 31, 1989.

Rehearing Denied March 27, 1989.

Thomas J. Greenan of Ferguson & Burdell, Seattle, Wash. (Robert T. Stephan, Atty. Gen. for State of Kan., William L. Webster, Atty. Gen. for State of Mo., Donald D. Barry and Deborah Farrar of Donald D. Barry, Chtd., Topeka, Kan., James E. Hurt of Ferguson & Burdell, Seattle, Wash., Jack C. Chestnut of Chestnut & Brooks, P.C., Minneapolis, Minn., Thomas H. Brill, Kansas City, Mo., R. Lawrence Ward, Jennifer Gille Bacon, Russell S. Jones, Jr., and Ann E. Carlson of Shughart, Thomson & Kilroy, P.C., Kansas City, Mo., with him on the briefs), for plaintiffs-appellants State of Kan. and State of Mo.

Michael F. Saunders of Spencer Fane Britt & Browne, Kansas City, Mo. (Basil W. Kelsey and Frank B.W. McCollum of Spencer Fane Britt & Browne, Overland Park, Kan., Curtis E. Woods and Teresa A. Woody of Spencer Fane Britt & Browne, Kansas City, Mo., John K. Rosenberg and David P. Mudrick, Topeka, Kan., Ralph Foster and John P. DeCoursey, Wichita, Kan., with him on the brief), for plaintiff-appellees Kansas Power & Light Co. and Kansas Gas & Elec. Co.

Sally R. Burger (William H. Sanders, Sr., Floyd R. Finch, Jr., and Katharine Bunn of Blackwell Sanders Matheny Weary & Lombardi, Kansas City, Mo., James D. Griffin of Blackwell Sanders Matheny Weary & Lombardi, Overland Park, Kan., Randall B. Palmer of UtiliCorp United Inc., Kansas City, Mo., with her on the brief), for plaintiff-intervenor-appellee UtiliCorp United Inc.

Kirkland & Ellis, Chicago, Ill.; Watson, Ess, Marshall & Enggas, Olathe, Kan., on the brief for defendant-appellee Amoco Production Co.

Skadden, Arps, Slate, Meagher & Flom, Washington, D.C.; Stinson, Mag & Fizzell, Kansas City, Mo., on the brief for defendants-appellees Cities Service Oil and Gas Corp. and CSG Exploration Co.

Before SEYMOUR, MOORE and BRORBY, Circuit Judges.

BRORBY, Circuit Judge.

This appeal involves a single issue: May residential consumers who are indirect purchasers of natural gas maintain an antitrust suit against the alleged antitrust violators?

## I.

Three investor-owned public utilities, the Kansas Power & Light Company, Kansas Gas & Electric Company, and UtiliCorp United Inc., filed separate complaints against defendants Amoco Production Co., Cities Service Oil and Gas Corporation, CSG Exploration Company, The Moxa Limited Partnership, and The Wamsutter Limited Partnership, alleging, *inter alia*, that all defendants illegally conspired to artificially inflate the price of natural gas produced from various natural gas fields in Wyoming. The gas was then transported and sold to the public utilities by the conspiring defendant, Williams Natural Gas Company, an interstate pipeline company.

The states of Kansas and Missouri (the States) filed similar suits wherein basically they asserted two types of claims against the same defendants: (1) on behalf of residential consumers who purchased natural gas from the public utilities, the States acting in a *parens patriae* capacity; and (2) on behalf of state agencies, municipalities, and other political subdivisions that purchased gas directly from Williams Natural Gas Company. These suits were consolidated.

The defendants asserted various defenses, including allegations that the public utility plaintiffs lack standing under § 4 of the Clayton Act, 15 U.S.C. § 15 (1982), in that plaintiffs had not been injured in their business or property because the public utilities had passed on illegal increases in the price of natural gas to the ultimate consumer who paid the entire cost of antitrust injuries. The public utilities then filed motions for summary judgment to prohibit these pass-on defenses under *Hanover Shoe, Inc. v. United Shoe Machinery*

*Corp.*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed. 2d 1231 (1968).

The trial court granted partial summary judgment in favor of the public utilities prohibiting the use by the defendants of the pass-on defense. The trial court characterized the motions as "in reality, motions to dismiss the States of Kansas and Missouri in their *parens patriae* capacity," and *sua sponte* dismissed the *parens patriae* claims asserted by the States.

The trial court's thorough and analytical Memorandum and Order may be found in *In re Wyoming Tight Sands Antitrust Cases*, 695 F.Supp. 1109 (D.Kan.1988).

The States sought and obtained interlocutory appellate review of a certified question. The public utilities are the appellees. The defendants are not involved in this appeal. At the request of the States, the question certified to the court pursuant to 28 U.S.C. § 1292(b) is as follows:

> In a private antitrust action under 15 U.S.C. § 15 involving claims of price fixing against the producers of natural gas, is a State a proper plaintiff as *parens patriae* for its citizens who paid inflated prices for natural gas, when the lawsuit already includes as plaintiffs those public utilities who paid the inflated prices upon direct purchase from the producers and who subsequently passed on most or all of the price increase to the citizens of the State?

*Wyoming Tight Sands*, 695 F.Supp. at 1120.

The States now quarrel with the certified question. The States point out that all of the utilities that purchased the alleged price-fixed gas are not present as plaintiffs and assert that *all* of the illegal overcharges were passed on to residential consumers. The utilities assert the proposed modifications to the question are irrelevant to the issues in this appeal, and ask us to disregard the proposed factual allegations and consider the question certified by the district court.

This court will answer the question certified to us by the district court for the reasons contained in the body of this opinion.

## II.

The defendant Williams Natural Gas Company is alleged to have transported natural gas from gas fields in Wyoming and sold it to the public utilities. The remaining defendants, being the producers of the natural gas, are alleged to have conspired with Williams Natural Gas Company, the pipeline company, to artificially inflate the price of the natural gas.

The public utilities have sold or used the natural gas purchased from the pipeline company in different ways and therefore occupy different levels in the distribution chain. Kansas Gas & Electric Company purchased gas directly from the pipeline company for use in generating electricity, and the electricity was then sold and delivered to commercial, industrial and residential customers. Kansas Power & Light Company and UtiliCorp United Inc. purchased natural gas directly from the pipeline company for their own industrial use and for delivery to commercial, industrial and residential consumers. All three of the public utilities operate as regulated monopolies within defined service areas.

The trial court made no findings of fact concerning how much of the natural gas overcharges were passed on to the commercial, industrial and residential consumers. The States offered evidence that all the overcharges were passed on to the ultimate consumers. The trial court apparently based its partial summary judgment upon the theory that there was no need to decide whether the allegedly illegal overcharges were passed on in whole or part. The question certified to us states that "most or all" of the price increase was passed on to the consumers.

The states of Kansas and Missouri are bringing two claims. The first relates to direct purchases of natural gas made by the States and its various instrumentalities. This claim is not now before this court. The States' second claim is in its capacity as *parens patriae* on behalf of natural persons residing therein who are resi-

dential indirect purchasers of natural gas.[1] This is the claim we now decide.

## III.

The States acknowledge the basic rule as set forth in *Hanover Shoe*, 392 U.S. 481, 88 S.Ct. 2224, and as expanded in *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). These cases hold that only the direct purchaser, and no other in the distribution chain, is the "party injured" within the meaning of § 4 of the Clayton Antitrust Act, 15 U.S.C. § 15. Stated differently, only the direct purchaser may sue for and recover the full amount of the illegal overcharge.

All rules have exceptions, and the basic rule set forth above has at least two, the cost-plus exception and the control exception. The States contend they fall squarely into either or both of these exceptions and should therefore be allowed to proceed with their suits on behalf of the residential consumers. The States, in their joint reply brief, concede the utilities' right to sue for and recover the alleged damages on behalf of the commercial and industrial customers of the utilities.

■ The first exception to the basic rule is what we have labeled as the cost-plus exception. The genesis of this exception may be found in *Hanover Shoe*. There the Supreme Court recognized that "there might be" an exception to the rule "for instance, when an overcharged buyer has a pre-existing 'cost-plus' contract, thus making it easy to prove that he has not been damaged." *Id.* 392 U.S. at 494, 88 S.Ct. at 2232. The Supreme Court further elaborated on this exception in *Illinois Brick* when it said:

> *Hanover Shoe* indicated the narrow scope it intended for any exception ... by citing, as the only example ... a pre-existing cost-plus contract. In such a situation, the purchaser is insulated

from any decrease in its sales as a result of attempting to pass on the overcharge, because its customer is committed to buying a fixed quantity regardless of price.

*Id.* 431 U.S. at 735–36, 97 S.Ct. at 2069–70. We interpret this exception as requiring a pre-existing cost-plus contract for a fixed quantity. We also note the Supreme Court did not say this would constitute an exception but rather that it "might be," and for this reason we have narrowly construed the exception as also requiring a fixed quantity.

The States now assert that their system of price regulation of natural gas utilities creates a cost-plus pricing arrangement that, coupled with the residential consumers' need to purchase their full requirements of natural gas from the utilities, places the residential consumers squarely within the cost-plus exception. In making this assertion, the States place great reliance on *State ex. rel. Hartigan v. Panhandle Eastern Pipe Line Co.*, 852 F.2d 891 (7th Cir.), *cert. denied*, — U.S. —, 109 S.Ct. 543, 102 L.Ed.2d 573 (1988).

■ Prior to analyzing the States' contentions, we must delve deeper into *Hanover Shoe* and then into *Illinois Brick*, as we can glean several principles therefrom to guide us in deciding this case. The direct purchaser is entitled to damages if he raises the price for his own product. *Hanover Shoe*, 392 U.S. at 489, 88 S.Ct. at 2228–29. Considerations of *stare decisis* weigh heavily in the area of statutory construction where Congress is free to change the Supreme Court's interpretation of its language. *Illinois Brick*, 431 U.S. at 736, 97 S.Ct. at 2069–70. New dimensions of complexity would be added to treble-damage suits and seriously undermine their effectiveness if massive efforts were made to apportion the recovery among all poten-

---

**1.** It should be noted that §§ 4C through 4H of the Clayton Act, 15 U.S.C. §§ 15c through 15h, which is sometimes described as the Hart–Scott–Rodino Antitrust Improvements Act of 1976, empowers state attorneys general to bring treble-damage actions as *parens patriae* on behalf of resident natural persons "for injury sus-

tained ... to their property" by reason of any Sherman Act violations. The parties have not argued that this law eliminates the basic rule that only a direct purchaser may sue. We assume that this statutory provision comes into play when the individual consumers are the direct purchasers.

tial plaintiffs. *Id.* at 737, 97 S.Ct. at 2070. There exists a serious problem of measuring the change in quantities of the natural gas purchased by consumers in response to a change in price. *Id.* at 742, 97 S.Ct. at 2072–73. There should be no exceptions to the basic rule for particular types of markets. *Id.* at 744, 97 S.Ct. at 2073–74. The increase in complexity of treble-damage suits will result in a reduction in the effectiveness of these suits. *Id.* at 745, 97 S.Ct. at 2074. There is a long-standing policy of encouraging vigorous private enforcement of the antitrust laws. *Id.* at 745, 97 S.Ct. at 2074.

■ We may distill these principles and summarize them by stating that the reasons given by the Supreme Court to justify its interpretation of the statute in *Hanover Shoe* and *Illinois Brick* are: (1) *stare decisis;* (2) encourage vigorous enforcement of the antitrust laws by reducing the expense of trial by eliminating unnecessary complications; (3) give to the direct purchaser an incentive to discover and prosecute antitrust violations; (4) avoid the problems of apportionment of damages; and (5) exceptions to the basic rule are to be narrow in scope.

First, as to *stare decisis.* *Illinois Brick* contains a message to Congress as well as to students of the law. That message is simple. The phrase "[a]ny person who shall be injured" as used in § 4 of the Clayton Act means only a direct purchaser from the antitrust violator. In short, *stare decisis* requires that when a decision of the Supreme Court is made, it is binding on courts of appeals. In this case, the rule is clear, and the Supreme Court has cautioned us concerning expansions to the exception. Were we to broadly construe the exceptions, we would also be diluting the clear message given to Congress concerning the Supreme Court's construction of § 4 of the Clayton Act.

Second, as to avoiding adding complexity and expense to antitrust suits. Were we to construe the law to allow the States to pursue their *parens patriae* claims, then unnecessary issues would be added to the trial, including the unresolved factual issue of how much of the alleged illegal overcharge was passed on to the residential consumers of each utility. If all overcharges were passed on, then allowing the consumers to prove and collect the damages could result in the antitrust violators escaping the payment of damages relating to decreased demand by residential consumers due to the higher price. Complex issues of proof will grow geometrically if the States press their consumers' demands, unless we should rule as a matter of law that the utilities' share of the alleged damages are likewise passed on to the consumers. This we are not prepared to do, given the factual record before us. The question certified to us provides that "most or all" of the illegal price increase was passed on.

Third, as to giving the direct purchaser an incentive to discover and prosecute the antitrust violator. It can be argued that enforcement of the antitrust laws would not be imperiled by allowing the States to pursue their claims in this case. But what of the next case? By removing an incentive for a utility to discover and enforce antitrust violations, would we not be shifting the incentive to an indirect purchaser? Would we not be shifting the cost of policing and enforcing the antitrust laws to the states? Would we not be undercutting the basic rationale for the Supreme Court's decisions in *Hanover Shoe* and *Illinois Brick?* As stated by the Supreme Court in *Hanover Shoe:*

> [A]ntitrust laws will be more effectively enforced by concentrating the full recovery for the overcharge in the direct purchasers rather than by allowing every plaintiff potentially affected by the overcharge to sue only for the amount it could show was absorbed by it.

*Id.* at 735, 97 S.Ct. at 2069.

The argument can be made that the utility really has no incentive to sue because the public utility regulatory commission of the state may force the utility to pass on to the consumers all damages the utility may recover. This is a question we do not answer. It is sufficient to state that a utility filed first in this case. It should also be noted that the utilities' motions to strike

the pass-on defense asserted by the gas suppliers and transporters was characterized by the trial court as being in reality a motion to strike the States' *parens patriae* claim. It is reasonable to assume that the public utilities must believe there is something for their benefit in pursuing these actions. Allowing the States to press the claims of the indirect purchasers will result in the probability that direct purchasers will fail to discover and aggressively assert antitrust claims.

Fourth, as to apportioning damages. The States assert there is no problem in apportioning the hoped-for damages in this case. They contend that it is a simple matter of proving how much natural gas went to the residential consumers and multiplying this by the unit illegal overcharge. The States may have an overly simplistic view of this problem and may not have considered the nature of the defenses which will probably be asserted at trial. Any allocation of illegal overcharges to the residential consumers may require tracing the sale from the wellhead through each level of distribution in order to establish the amount of illegal gas costs actually paid by the consumers in each state, probably resulting in exactly that which the Supreme Court prohibited, i.e., adding new dimensions of complexity to antitrust suits. There is no way this court could or would instruct the parties on proof of damages prior to trial as there are too many facts not now known. Suffice it to say that apportioning damages will probably not be as simple as contended by the States.

Looking at the rationales underlying the basic rule, we are of the opinion that to allow the cost-plus exception urged upon us by the States would undercut the very reasons for the basic rule.

Fifth, as to the words of the exception itself. To say that the utilities have a cost-plus fixed fee contract for a fixed quantity with their residential consumers would amount to fitting a square peg into a round hole. There exists no contract between the utilities and their residential consumers for any particular quantity. Obviously a residential consumer could stop using natural gas and convert to an alternative source of energy such as wood or coal, or a consumer could decrease the quantity of natural gas used. The apparent reason for the fixed-quantity requirement to the cost-plus exception is simply that there would exist no problem of apportionment between the direct and indirect purchasers. In this case, the problem of apportionment would exist even if all of the overcharge was passed on, because there still exists the issue of decreased residential demand caused by the higher price. We hold that suit by residential consumers of natural gas who are not direct purchasers does not lie within the cost-plus exception to the basic rule.

The States urge us to apply the law as enunciated in *Panhandle Eastern*, 852 F.2d 891. This we decline to do.

*Panhandle Eastern* held, in effect, that the purchased gas adjustment component of gas utility regulation, coupled with the fact that residential consumers are obligated to purchase their full requirements of natural gas from monopolistic utilities, placed the residential consumer squarely within the cost-plus exception of *Hanover Shoe* and *Illinois Brick*.

We distinguish the facts of this case from those in *Panhandle Eastern*. In *Panhandle Eastern*, there was formal cost-plus pricing (as we may have here); a contract that required 100 percent passing on (as we may or may not have here);[2] and an acknowledgment of 100 percent pass-on in every kilowatt-hour resold to the utilities' residential consumers (which we may or may not have here). In *Panhandle Eastern* the utility had delayed in filing suit, and there was a serious question as to whether or not the statute of limitations had expired. In *Panhandle Eastern* the

---

**2.** In this case, there is a purchased-gas adjustment clause in the rate tariffs of Kansas Power & Light. There is an energy-cost adjustment clause, which operates in a similar manner, in Kansas Gas & Electric's operating tariff in Kansas. In Lawrence, Kansas, the Kansas Public Service Company, a division of UtiliCorp, did not resell natural gas by way of a purchased-gas adjustment clause mechanism.

court was dealing with the residential consumers of a single utility; here we are dealing with utilities that occupy different levels on the distribution chain within two states, and with two states and their attendant public utility rate regulation schemes. In this case we have yet another unresolved factual issue: UtiliCorp asserts in its brief that more of the allegedly illegal overcharges could be recovered if the utilities were allowed to press the claims of the residential consumers, an assertion which the court in *Panhandle Eastern* apparently did not face. The Seventh Circuit itself stated in *Panhandle Eastern* that this case (*Wyoming Tight Sands*, 695 F.Supp. 1109) was distinguishable from *Panhandle Eastern.* 852 F.2d at 893. The most important difference between *Panhandle Eastern* and this case may be that there was apparently no doubt in *Panhandle Eastern* that the entire overcharge was passed on, and there was no need to apportion damages between the direct and indirect purchasers. In this case, the amount of the overcharge passed on may be an unresolved question of fact. However, even if we assume, as we do for the purpose of deciding the issues before us, that there was a perfect and provable pass-on of the allegedly illegal overcharge, we are not persuaded that the facts of this case would place this case into the narrow exception to the rule. At the most, a perfect pass-on might solve the problem of apportioning damages between the direct and indirect purchaser but for the issue of decreased demand due to higher prices. This does not justify shifting the incentive to prosecute alleged antitrust violations from the direct purchaser, who is the closest to the violator and who presumably has the better knowledge, to the indirect purchaser. A perfect pass-on of all illegal overcharges may exist in a model world but probably does not exist in the real world. A perfect pass-on, standing alone, is not sufficient reason to allow an indirect purchaser to sue an alleged antiturst violation. We narrowly construe the cost-plus exception as to do otherwise would be to do that which the Supreme Court has cautioned against. We hold the controlling cases are *Hanover Shoe* and *Illinois Brick,* and not *Panhandle Eastern.*

The States also rely upon *In re New Mexico Natural Gas Antitrust Litig.,* 1982–1 Trade Cases ¶ 64,685 (D.N.M.1982) [1982 WL 1827]. We distinguish this case, as the direct purchasers were billing their consumers monthly and separately for a "cost of gas component," and perhaps more importantly, the residential consumers constituted the first direct purchasers from the conspiring defendants.

We are not persuaded that the cost-plus contract exception of *Hanover Shoe* is applicable to the facts of this case. If we were to adopt the reasoning of *Panhandle Eastern,* we would in reality be carving out yet another exception (regulation of public utilities) to the basic rule that only a direct purchaser may sue for the antitrust violation, and this we are unwilling to do.

### IV.

In *Illinois Brick,* the Supreme Court set forth another situation where the pass-on defense "might be" permitted, and that is where the direct purchaser is owned or controlled by its customer. *Id.* 431 U.S. at 736 n. 16, 97 S.Ct. at 2070 n. 16.

The States argue that as they exercise plenary authority over the utilities, particularly with regard to rates, this fact equates to placing the States within the control exception. We do not agree. As the trial court stated: "The utilities are for-profit, publicly held corporations and simply do not fit within this exception." *Wyoming Tight Sands,* 695 F.Supp. at 1117. Calling a cow a horse does not make it so. State regulation of utility rates does not give to the states or its citizens ownership or control of the public utilities. We hold that the public utilities in this case are neither owned nor controlled by its customers, and we therefore conclude that the "control exception" does not apply to this controversy.

### V.

The States next assert that allowing residential consumers to sue is fully consistent

with the prior decisions of this court, citing *Central Nat'l Bank v. Rainbolt,* 720 F.2d 1183 (10th Cir.1983); *Zinser v. Continental Grain Co.,* 660 F.2d 754 (10th Cir.1981), *cert. denied,* 455 U.S. 941, 102 S.Ct. 1434, 71 L.Ed.2d 652 (1982); and *Jones v. Ford Motor Co.,* 599 F.2d 394 (10th Cir.1979). These cases are inapposite. None involves pass-on or cost-plus contracts.

The States next urge that *Illinois Brick* should not be read as a rigid bar to recovery on the part of all indirect purchasers and cite *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982), wherein plaintiff was allowed to maintain an antitrust suit as she was the person who was "out of pocket" by paying her psychologist when Blue Shield was exerting coercive pressure to induce its subscribers into selecting psychiatrists over psychologists, and *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983), wherein the Supreme Court held that a decision as to antitrust standing requires a case-by-case analysis of at least six factors.

These cases are distinguishable. In *Blue Shield,* the Supreme Court held that plaintiff was in essence the direct purchaser when it stated "it is not the employer as purchaser, but its employees as subscribers, who are out of pocket as a consequence of the plan's failure to pay benefits." *Id.* 457 U.S. at 475, 102 S.Ct. at 2546. The Court held that McCready had paid her psychologist; Blue Shield failed to pay her; and McCready's psychologist could link no claim of injury to himself arising from his treatment of McCready. In the instant case, the residential user of gas paid the utility and the utility can assert a claim of injury for decreased consumer demand. In *Associated Gen. Contractors,* the Supreme Court applied the policies underlying *Illinois Brick,* and dismissed the claims of a labor union for indirect damages, holding that the union's claim of consequential harm was insufficient as a matter of law. *Id.* 459 U.S. at 545, 103 S.Ct. at 912.

The States assert that the trial court should not have granted partial summary judgment as there may exist a genuine issue of material fact, i.e., did the utilities pass on all of the overcharges. In *Illinois Brick,* the Supreme Court stated, "[T]he process of classifying various market situations according to the amount of pass-on likely to be involved and its susceptibility of proof in a judicial forum would entail the very problems that the *Hanover Shoe* rule was meant to avoid." *Id.* 431 U.S. at 744–45, 97 S.Ct. at 2074. We therefore hold that the amount of illegal overcharges actually passed on by the utilities to its customers is not an issue of material fact necessary to a resolution of the narrow issue before this court.

We conclude that residential indirect purchasers of natural gas are not entitled to sue the alleged violators under either *Hanover Shoe* or *Illinois Brick.* The question certified to us is answered in the negative, and the judgment of the trial court, insofar as is necessary to answer the question certified, is

AFFIRMED.