**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| IN RE APPLE IPHONE ANTITRUST LITIGATION, | No. 14-15000 |
| | D.C. No. 4:11-cv-06714-YGR |
| ROBERT PEPPER; STEPHEN H. SCHWARTZ; EDWARD W. HAYTER; ERIC TERRELL, *Plaintiffs-Appellants*, | |
| v. | OPINION |
| APPLE INC., *Defendant-Appellee*. | |

Appeal from the United States District Court
for the Northern District of California
Yvonne Gonzalez Rogers, District Judge, Presiding

Argued and Submitted February 10, 2016
San Francisco, California

Filed January 12, 2017

Before: A. Wallace Tashima and William A. Fletcher,
Circuit Judges, and Robert W. Gettleman,[*] District Judge.

Opinion by Judge W. Fletcher

---

[*] The Honorable Robert W. Gettleman, United States District Judge for the Northern District of Illinois, sitting by designation.

## SUMMARY[**]

### Antitrust

The panel reversed the dismissal for lack of statutory standing of an antitrust complaint alleging that Apple, Inc., monopolized and attempted to monopolize the market for iPhone apps.

Plaintiffs argued that Fed. R. Civ. P. 12(g)(2) barred Apple from raising in its fourth Rule 12 motion to dismiss a statutory standing defense omitted from prior motions to dismiss. Agreeing with the Third and Tenth Circuits, the panel held that as a reviewing court, the court of appeals should generally be forgiving of a district court's ruling on the merits of a late-filed Rule 12(b)(6) motion. The panel concluded that any error in the district court's consideration on the merits of Apple's Rule 12(b)(6) motion to dismiss was harmless.

Disagreeing with the Eight Circuit's analysis in a similar case, the panel held that the plaintiffs were direct purchasers of iPhone apps from Apple, rather than the app developers, and therefore had standing to sue under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). The panel concluded that Apple was a distributor of iPhone apps, selling them directly to purchasers through its App Store. The panel remanded the case for further proceedings.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Mark C. Rifkin (argued), Alexander H. Schmidt, and Michael Liskow, Wolf Haldenstein Adler Freeman & Herz LLP, New York, New York; Francis M. Gregorek and Rachele R. Rickert, Wolf Haldenstein Adler Freeman & Herz LLP, San Diego, California; for Plaintiffs-Appellants.

Daniel M. Wall (argued), Christopher S. Yates, and Sadik Huseny, Latham & Watkins LLP, San Francisco, California; J. Scott Ballenger, Latham & Watkins LLP, Washington, D.C.; for Defendant-Appellee.

**OPINION**

W. FLETCHER, Circuit Judge:

In their current complaint, Plaintiffs allege that they purchased iPhones and iPhone applications ("apps") between 2007 and 2013, and that Apple has monopolized and attempted to monopolize the market for iPhone apps. In ruling on Apple's fourth motion to dismiss, the district court held that Plaintiffs lacked antitrust standing under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977).

We must decide two questions. First, we must decide whether Rule 12(g)(2) barred the district court from considering on the merits Apple's fourth motion to dismiss, brought under Rule 12(b)(6), in which Apple contended that Plaintiffs lack statutory standing under *Illinois Brick*. We conclude that the district court may have erred in considering this motion on the merits, but that its error, if any, was harmless. Second, we must decide whether Plaintiffs lack

statutory standing under *Illinois Brick.*    We hold that Plaintiffs are direct purchasers from Apple within the meaning of *Illinois Brick* and therefore have standing.

## I. Factual Allegations

The following factual narrative is drawn from Plaintiffs' current complaint.    Because the district court dismissed Plaintiffs' suit under Rule 12(b)(6) for failure to state a claim, we take as true all plausible allegations.

Apple released the iPhone in 2007.    The iPhone is a "closed system," meaning that Apple controls which apps—such as ringtones, instant messaging, Internet, video, and the like—can run on an iPhone's software.    In 2008, Apple launched the "App Store," an internet site where iPhone users can find, purchase, and download iPhone apps.    Apple has developed some of the apps sold in the App Store, but many of the apps sold in the store have been developed by third-party developers.    Apple earns a commission on each third-party app purchased for use on an iPhone.    When a customer purchases a third-party iPhone app, the payment is submitted to the App Store.    Of that payment, 30% goes to Apple and 70% goes to the developer.

Apple prohibits app developers from selling iPhone apps through channels other than the App Store, threatening to cut off sales by any developer who violates this prohibition. Apple discourages iPhone owners from downloading unapproved apps, threatening to void iPhone warranties if they do so.

## II.  Procedural History

The procedural history of this case is complex.  We describe as much of the history as is necessary to resolve the procedural question before us.  Four named plaintiffs filed a putative antitrust class action complaint ("Complaint 1") against Apple on December 29, 2011.  Counts I and II of Complaint 1 alleged monopolization and attempted monopolization of the iPhone app market by Apple.  Count III alleged a conspiracy between Apple and AT&T Mobility, LLC ("ATTM") to monopolize the voice and data services market for iPhones.  Plaintiffs alleged that they had purchased iPhones, but did not allege that they had ever purchased, or attempted to purchase, iPhone apps.  On March 2, 2012, Apple moved to dismiss the entire complaint under Rule 12(b)(7) for failure to join ATTM as a defendant.  This motion to dismiss was mooted when the district court consolidated the action with another action.

Seven named plaintiffs, including the original four plaintiffs, then filed a consolidated putative class action complaint ("Complaint 2") against Apple on March 21, 2012.  The allegations in Complaint 2 were essentially the same as those in Complaint 1, and the same three Counts were alleged.  None of the named plaintiffs alleged that they had bought, or attempted to buy, an iPhone app.  ATTM was not added as a defendant. On April 16, 2012, Apple moved again to dismiss the entire complaint under Rule 12(b)(7) for failure to join ATTM as a defendant.  In the alternative, it moved to dismiss Count III under Rule 12(b)(6) for failure to state a claim for conspiracy between Apple and ATTM.  The district court granted without prejudice the motion to dismiss the entire complaint, even though Counts I and II alleged no wrongdoing by ATTM.  The court specifically ordered

Plaintiffs either to add ATTM as a defendant or to forgo Count III. It denied without prejudice Apple's motion to dismiss Count III under Rule 12(b)(6) on the ground that, in the absence of ATTM, the motion was premature.

Plaintiffs filed an amended consolidated complaint ("Complaint 3") on September 28, 2012. Complaint 3 was essentially the same as Complaint 2, except that Count III was now labeled as "Preserved for Appeal." None of the named plaintiffs alleged that they had ever purchased, or sought to purchase, iPhone apps, and ATTM was not named as a defendant. On November 2, 2012, Apple moved under Rule 12(f) to strike Claim III on the ground that ATTM had still not been named as a defendant. As part of the same motion, Apple moved to dismiss Counts I and II under Rule 12(b)(1) for lack of Article III standing, and under Rule 12(b)(6) for lack of statutory standing under *Illinois Brick*. This was the first time Apple had moved to dismiss Counts I and II. Relying on Rule 12(g)(2), Plaintiffs opposed Apple's motion to dismiss under Rule 12(b)(6) on the ground that Apple had not moved to dismiss these claims under Rule 12(b)(6) in its two previous motions under Rule 12.

The district court granted the Rule 12(f) motion to strike Count III. The district court also granted the Rule 12(b)(1) motion to dismiss Counts I and II for lack of subject matter jurisdiction, holding that Plaintiffs lacked Article III standing to bring those counts because Plaintiff failed to allege that they had purchased or attempted to purchase an iPhone app. The court declined to rule on the Rule 12(b)(6) motion to dismiss under *Illinois Brick*, concluding that, in the absence of an alleged Article III injury, any ruling would be advisory. The district court dismissed with leave to amend.

Plaintiffs filed a second amended consolidated complaint ("Complaint 4") on September 5, 2013. Complaint 4 alleged only the iPhone app monopolization claims, which had been Counts I and II of all of the earlier complaints. For the first time, Plaintiffs alleged that they had purchased iPhone apps, thereby alleging sufficient injury under Article III to support Counts I and II. Complaint 4 added the following allegation specifically addressed to statutory standing under *Illinois Brick*

> When an iPhone customer buys an app from Apple, it pays the full purchase price, including Apple's 30% commission, directly to Apple. . . . Apple sells the apps (or, more recently, licenses for the apps) directly to the customer, collects the entire purchase price, and pays the developers after the sale. The developers at no time directly sell the apps or licenses to iPhone customers or collect payments from the customers.

On September 30, 2013, Apple filed a motion to dismiss under Rule 12(b)(6), contending that Plaintiffs lacked statutory standing under *Illinois Brick*. The district court agreed and dismissed Complaint 4 with prejudice. Plaintiffs timely appealed.

## III.  Standard of Review

We review de novo alleged errors of law in interpreting Rule 12. *See Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 973 (9th Cir. 2010). We review de novo dismissals for failure to state a claim under Rule 12(b)(6). *Carlin v. DairyAmerica, Inc.*, 705 F.3d 856, 866 (9th Cir. 2013).

## IV.  Discussion

Plaintiffs make three arguments on appeal, of which we need to reach only two.  First, Plaintiffs argue that Rule 12(g)(2) barred Apple from raising its *Illinois Brick* statutory standing defense in its fourth Rule 12 motion to dismiss, and that the district court erred in deciding the motion on the merits.  Second, Plaintiffs argue that the district court erred in characterizing them as indirect purchasers from Apple, and therefore without statutory standing under *Illinois Brick*.  We address these two arguments in turn.

### A.  Late-filed Motions to Dismiss under Rule 12(b)(6)

Rule 12(g)(2) provides, "Except as provided in Rule 12(h)(2) or (3), a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion."  The consequence of omitting a defense from an earlier motion under Rule 12 depends on type of defense omitted.  A defendant who omits a defense under Rules 12(b)(2)-(5)—lack of personal jurisdiction, improper venue, insufficient process, and insufficient service of process—entirely waives that defense.  Fed. R. Civ. P. 12(h)(1)(A).  A defendant who omits a defense under Rule 12(b)(6)—failure to state a claim upon which relief can be granted—does not waive that defense.  Rule 12(g)(2) provides that a defendant who fails to assert a failure-to-state-a-claim defense in a pre-answer Rule 12 motion cannot assert that defense in a later pre-answer motion under Rule 12(b)(6), but the defense may be asserted in other ways.  Fed. R. Civ. P. 12(h)(2).

Our sister circuits disagree about the proper interpretation and application of Rule 12(g)(2). The Seventh Circuit has held that Rule 12(g)(2) does not foreclose a motion to dismiss under Rule 12(b)(6) when there has been a previous motion to dismiss under Rule 12. *See Ennenga v. Starns*, 677 F.3d 766, 773 (7th Cir. 2012) ("Rule 12(g)(2) does not prohibit a new Rule 12(b)(6) argument from being raised in a successive motion."). The Seventh Circuit misunderstands Rule 12, reading Rule 12(h)(1) to provide the only sanction for failure to raise a Rule 12 defense in a prior motion under the Rule. It is true that Rule 12(h)(1) singles out several Rule 12 defenses for an especially severe sanction. If a defense under Rule 12(b)(2)-(5) is not asserted in the first Rule 12 motion to dismiss, Rule 12(h)(1) tells us that the defense is entirely waived. But Rule 12(h)(2) provides a less severe sanction for failure to assert a defense under Rule 12(b)(6). If a failure-to-state-a-claim defense under Rule 12(b)(6) was not asserted in the first motion to dismiss under Rule 12, Rule 12(h)(2) tells us that it can be raised, but only in a pleading under Rule 7, in a post-answer motion under Rule 12(c), or at trial. *See*, *e.g.*, *English v. Dyke*, 23 F.3d 1086, 1091 (6th Cir. 1994) (correctly describing the operation of the rule).

The Third and Tenth Circuits have read Rule 12 correctly, but have been very forgiving of a district court's failure to follow Rule 12(g)(2). *See Leyse v. Bank of Am. Nat. Ass'n*, 804 F.3d 316, 321–22 (3d Cir. 2015) ("So long as the district court accepts all of the allegations in the complaint as true, the result is the same as if the defendant had filed an answer admitting these allegations and then filed a Rule 12(c) motion for judgment on the pleadings, which Rule 12(h)(2)(B) expressly permits."); *Albers v. Bd. of Cty. Comm'rs of Jefferson Cty., Colo.*, 771 F.3d 697, 704 (10th Cir. 2014) ("[W]hether the district court dismissed the complaint based

on a motion under Rule 12(b)(6) or rule 12(c) makes no difference for purposes of our review.  Therefore, any procedural error that may have been been committed would be harmless and does not prevent us from reaching the merits of the district court's decision.").

We agree with the approach of the Third and Tenth Circuits.  We read Rule 12(g)(2) in light of the general policy of the Federal Rules of Civil Procedure, expressed in Rule 1. That rule directs that the Federal Rules "be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding."  Fed. R. Civ. P. 1.  Denying late-filed Rule 12(b)(6) motions and relegating defendants to the three procedural avenues specified in Rule 12(h)(2) can produce unnecessary and costly delays, contrary to the direction of Rule 1.

District courts in this circuit and others are well aware of this.  For example, as the late Judge Pfaelzer recently wrote:

> Rule 12(g) is designed to avoid repetitive motion practice, delay, and ambush tactics.  If the Court were to evade the merits of Defendants' . . . defenses here, Defendants would be required to file answers within 14 days of this Order.  They would presumably assert [the same defenses] in those answers. Defendants would then file Rule 12(c) motions, the parties would repeat the briefing they have already undertaken, and the Court would have to address the same questions in several months.  That is not the intended

effect of Rule 12(g), and the result would be in contradiction of Rule 1's mandate[.]

*Allstate Ins. Co. v. Countrywide Fin. Corp.*, 824 F. Supp. 2d 1164, 1175 (C.D. Cal. 2011) (citations omitted); *see also Banko v. Apple, Inc.*, No. 13-02977 RS, 2013 WL 6623913, at *2 (N.D. Cal. Dec. 16, 2013) (internal quotations omitted) ("Although Rule 12(g) technically prohibits successive motions to dismiss that raise arguments that could have been made in a prior motion . . . courts faced with a successive motion often exercise their discretion to consider the new arguments in the interests of judicial economy."); *Davidson v. Countrywide Home Loans, Inc.*, No. 09-CV-2694-IEG JMA, 2011 WL 1157569, at *4 (S.D. Cal. Mar. 29, 2011) (internal quotations omitted) ("Rule 12(g) applies to situations in which a party files successive motions under Rule 12 for the sole purpose of delay[.]"); *Doe v. White*, No. 08-1287, 2010 WL 323510, at *2 (C.D. Ill. Jan. 20, 2010) (citing the "substantial amount of case law which provides that successive Rule 12(b)(6) motions may be considered where they have not been filed for the purpose of delay, where entertaining the motion would expedite the case, and where the motion would narrow the issues involved."). Moore's *Federal Practice* endorses this approach. *See* 2-12 Moore's Federal Practice - Civil § 12.23 ("[B]ecause [a 12(b)(6) defense] is so basic and was not waived, [a district] court might properly entertain a second motion if it were convinced it was not interposed for delay and that addressing it would expedite disposition of the case on the merits.").

Recognizing the practical wisdom of these district courts, and of the Third and Tenth Circuits, we conclude that, as a reviewing court, we should generally be forgiving of a district

court's ruling on the merits of a late-filed Rule 12(b)(6) motion. With that in mind, we turn to the case now before us.

Apple's first two motions to dismiss under Rule 12(b)(7), directed to Complaints 1 and 2, were designed to force Plaintiffs to add ATTM as a necessary and indispensable party under Rule 19. These were appropriate motions, given that Count III alleged a conspiracy between Apple and ATTM to monopolize voice and data services, and given that Plaintiffs had sufficiently alleged Article III injury to make that claim. After Plaintiffs filed Complaint 3, which had been amended to recognize the success of Apple's motions under Rule 12(b)(7), Apple moved again to dismiss. It now moved for the first time to dismiss Counts I and II, relying on Rules 12(b)(1) and 12(b)(6). A Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, including for failure to allege injury sufficient for Article III standing, may be made at any time. *See* F. R. Civ. P. 12(b)(1) and 12(h)(3). Apple's earlier Rule 12 motions to dismiss thus in no way foreclosed its late-filed motion to dismiss Counts I and II for lack of Article III standing. The district court granted Apple's Rule 12(b)(1) motion to dismiss. It refused to decide Apple's Rule 12(b)(6) motion to dismiss for lack of statutory standing on the ground that, in the absence of an Article III case or controversy, a ruling on the motion would be an advisory opinion.

Complaint 4 realleged Counts I and II, and finally alleged, for the first time, that Plaintiffs had purchased iPhone apps. That is, Complaint 4 finally alleged sufficient injury to confer Article III standing to support Counts I and II. Apple moved to dismiss for the fourth time, this time only under Rule 12(b)(6) for lack of statutory standing under *Illinois Brick*.

Apple's motions to dismiss for lack of standing under Rule 12(b)(6), made in its third and fourth motions to dismiss under Rule 12, may not have been late-filed within the meaning of Rule 12(g)(2). Indeed, there is an argument that Apple's motion to dismiss Complaint 3 under Rule 12(b)(6), made as part of its third Rule 12 motion to dismiss, was not late but premature. At that point, Plaintiffs had not alleged injury sufficient to confer subject matter jurisdiction over Counts I and II. For that reason, the district court properly refused to rule on Apple's Rule 12(b)(6) motion, holding that, in the absence of an allegation of Article III standing, any ruling would be advisory. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998). The district court was willing to decide Apple's Rule 12(b)(6) motion to dismiss for lack of statutory standing only when Plaintiffs finally alleged, in Complaint 4, sufficient injury to confer Article III standing to bring the challenged counts.

Even if we assume arguendo that Apple's motion to dismiss under Rule 12(b)(6), made in its fourth Rule 12 motion, was late, any error by the district court in considering the motion on the merits was harmless. First, the four motions to dismiss, culminating in the motion to dismiss Complaint 4 under Rule 12(b)(6), do not appear to have been filed for any strategically abusive purpose. Apple promptly moved to dismiss each of Plaintiffs' four complaints. Apple's first two motions to dismiss were made on March 2 and April 16, 2012, immediately after the filing of Plaintiffs' first two complaints. Plaintiffs filed Complaint 3 on September 28, 2012. Apple moved to dismiss under Rules 12(b)(1) and 12(b)(6) on November 2, 2012. Plaintiffs filed Complaint 4 on September 5, 2013. Apple moved to dismiss under Rule 12(b)(6) on September 30, 2013. We recognize that Apple could have moved, along with its motion to

dismiss for failure to join ATTM under Rule 12(b)(7), to dismiss Counts I and I for lack of subject matter jurisdiction under Rule 12(b)(1).  If that motion had been made and granted, Plaintiffs would likely have amended their complaint earlier to allege purchases of iPhone apps.  But we see no harm to Plaintiffs caused by Apple's delay in making its Rule 12(b)(1) motion.  Second, resort to any of the three default alternatives specified in Rule 12(h)(2)—a pleading under Rule 7(a), a post-answer motion to dismiss on the pleadings under Rule 12(c), or a defense asserted at trial—would have substantially delayed resolution of the *Illinois Brick* statutory standing question, and would have done so for no apparent purpose.  The district court's decision on the merits of Apple's Rule 12(b)(6) motion materially expedited the district court's disposition of the case, which was a benefit to both parties.

We therefore conclude that any error committed by the district court in ruling on Apple's motion to dismiss under Rule 12(b)(6) for lack of statutory standing under *Illinois Brick*, if indeed there was error, was harmless.  We now turn to the merits of the district court's decision.

## B.  Standing Under *Illinois Brick*

### 1.  The Direct-Purchaser Rule

Under § 4 of the Clayton Act, "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue . . .  and shall recover threefold the damages by him sustained[.]"   15 U.S.C. § 15(a). Notwithstanding the statutory term "any person," the Supreme Court has limited those who may sue for antitrust damages.  The general rule is that only "the overcharged

direct purchaser, and not others in the chain of manufacture or distribution," has standing to sue. *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 729 (1977).

The rule originated in *Hanover Shoe v. United Shoe Machinery Co.*, 392 U.S. 481 (1968). Hanover, a shoe manufacturer, alleged that the United Shoe Machinery Corporation had used its monopoly over shoe-manufacturing machinery to lease machines to Hanover at supracompetitive rates. *Id.* at 483–84. United argued that Hanover had no legally cognizable injury under the antitrust laws because it had passed any illegal overcharge on to its customers. *Id.* at 491. The Court rejected United's "defensive" use of the pass-on theory. For purposes of antitrust damages, the Court held, the direct purchaser is injured by the full amount of the overcharge irrespective of who ultimately bears the cost of that injury. *Id*. at 494.

The Court gave two reasons for its holding. First, the dollar figures necessary to demonstrate that an intermediary has avoided economic injury by passing an overcharge onto his customers were, the Court found, "virtually unascertainable." *Id*. at 493. A litigant would need to show, among other things, that the intermediary raised the price of his product as a result of the illegal overcharge; that the higher price charged by the intermediary did not affect the intermediary's profits by reducing the volume of sales; and that the intermediary could not or would not have raised its price absent the overcharge. The challenges to making such a showing, the Court observed, would "normally prove insurmountable." *Id*. Second, if an antitrust violator were permitted to defend against suit by showing that the intermediary passed the alleged overcharge onto its customers, those customers would logically be entitled to

damages for any portion of the overcharge they paid. In many cases, however, there would be a large number of customers, each of whom would have "only a tiny stake in a lawsuit," and who, in the view of the Court, would thus have "little interest in attempting a class action." *Id*. at 494. As a result, according to the Court, antitrust violators would "retain the fruits of their illegality because no one . . . would bring suit against them." *Id*.

Nine years after *Hanover Shoe*, the Supreme Court rejected an attempt to use the pass-on theory "offensively." In *Illinois Brick*, 431 U.S. 720 (1977), the State of Illinois sued a concrete block manufacturer for allegedly fixing the price of concrete blocks. The manufacturer had sold the blocks to masonry contractors who had used the blocks to build masonry structures. The masonry contractors sold the structures to general contractors who put the structures in buildings they sold to the State. The State alleged that the contractors had passed on the manufacturer's illegal overcharge at both stages of the distribution chain, driving up the State's costs by $3 million.

The Supreme Court refused to recognize the passed-on overcharges as a basis for antitrust standing. As in *Hanover Shoe*, the challenges of tracing the effects of an overcharge at each stage of a distribution chain were, in the Court's view, insurmountable. Even if indirect purchasers could meet these challenges, sorting out the complicated variables would clog the courts with protracted and expensive litigation. *Id.* at 732. And even then problems of administrability and enforcement would remain. Allowing an indirect purchaser to sue for whatever portion of an overcharge it was assessed would either "create a serious risk of multiple liability for defendants," *id.* at 730, or reduce the effectiveness of antitrust

laws by diluting the share of damages better-situated direct purchasers might secure by bringing suit.  *Id.* at 731–35.

The Supreme Court has reaffirmed the *Hanover Shoe*/*Illinois Brick* rule in a case where the practical considerations that gave rise to the rule were not nearly as compelling as in the two foundation cases.  In *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199 (1990), customers of public utilities sued natural gas producers for alleged violations of Section 4 of the Clayton Act.  Plaintiffs conceded that they were direct purchasers from the public utilities and indirect purchasers from the producers.  But they argued that the direct purchasers, because they were regulated public utilities, had the incentive and ability to build into their pricing structure their entire cost of purchasing natural gas. *Id*. at 205.  On the other side of the coin, because they were public utilities, they had the obligation to pass on the entirety of any cost savings resulting from a reduced purchasing cost. *Id*. at 212.  Therefore, the complications in determining the amount of illegal overcharge that had been, or could be, passed on that had so concerned the Court in *Hanover Shoe* and *Illinois Brick* were largely absent.  The Court nonetheless applied the direct/indirect purchaser rule, holding that "[i]n the distribution chain," the customers were "not the immediate buyers from the alleged antitrust violators." *UtiliCorp*, 497 U.S. at 207.

The transactions in *Hanover Shoe* and *Illinois Brick* have the same structure.  In both cases, a monopolizing or price-fixing manufacturer sold or leased a product to an intermediate manufacturer at a supracompetitive price.  The intermediate manufacturer (in *Illinois Brick*, two intermediate manufacturers) then used that product to create another product, which was ultimately sold to the consumer.  The

details in *UtiliCorp* are different, but the basic structure is the same. In *UtiliCorp*, a monopolizing producer sold a product to a distributor at an allegedly supracompetitive price. The distributor then sold the product to the consumer. In all three cases, the consumer was an indirect purchaser from the manufacturer or producer who sold or leased the product to the intermediary. The consumer was a direct purchaser from the intermediate manufacturer (*Hanover Shoe* and *Illinois Brick*) or from the distributor (*UtiliCorp*). The consumer did not have standing to sue the manufacturer or producer, but did have standing to sue the intermediary, whether the intermediate manufacturer or the distributor.

## 2. Plaintiffs Are Direct Purchasers

The question before us is whether Plaintiffs purchased their iPhone apps directly from the app developers, or directly from Apple. Stated otherwise, the question is whether Apple is a manufacturer or producer, or whether it is a distributor. Under *Hanover Shoe*, *Illinois Brick*, and *UtiliCorp*, if Apple is a manufacturer or producer from whom Plaintiffs purchased indirectly, Plaintiffs do not have standing. But if Apple is a distributor from whom Plaintiffs purchased directly, Plaintiffs do have standing.

We do not write on a clean slate in this circuit. In *Delaware Valley Surgical Supply, Inc. v. Johnson & Johnson*, 523 F.3d 1116 (9th Cir. 2008), plaintiff Bamberg County Memorial Hospital & Nursing Center ("Bamberg") brought suit against Johnson & Johnson ("J & J") alleging that J & J "impermissibly leveraged its monopoly power in sutures to create a monopoly" in the market for endomechanical products. *Id*. at 1118. Bamberg did not purchase medical supplies directly from J & J. Instead, a group purchasing

organization ("GPO"), of which Bamberg was a member, negotiated purchasing contracts with J & J and a distributor, Owens & Minor ("O & M"). J & J and O & M, in turn, had a distributorship agreement specifying that O & M would pay J & J the price negotiated by the GPO. Bamberg would purchase from O & M, paying O & M this price plus a set percentage markup. Pursuant to this agreement, J & J supplied products to the distributor, O & M, which in turn sold and delivered the products to Bamberg, at a price equal to the cost O & M paid for the products plus the set markup determined by a contract between O & M and Bamberg. *Id*. at 1119.

Applying the "straightforward," "bright line" rule of *Illinois Brick*, we held in *Delaware Valley* that Bamberg was an indirect purchaser from J & J, the manufacturer, and a direct purchaser from O & M, the distributor. *Id*. at 1122, 1120. That Bamberg and J & J had a contract setting the wholesale price of the products, and that the price Bamberg paid O & M was "set, in part, by an agreement negotiated . . . on behalf of Bamberg" with J & J were not determinative. *Id.* at 1122. The determinative fact was that O & M was a distributor who sold the products directly to Bamberg. Because Bamberg bought directly from O & M, the distributor, it lacked standing to sue J & J, the manufacturer. The necessary corollary of *Delaware Valley* is that Bamberg would have had standing to sue O & M, the distributor.

The Eighth Circuit has considered a transaction closely resembling the transaction in the case before us. In *Campos v. Ticketmaster Corp.*, 140 F.3d 1166 (8th Cir. 1998), plaintiffs alleged that Ticketmaster used its monopolistic control over concert ticket distribution services to charge supracompetitive fees for those services. The majority in

*Ticketmaster* held that a party's status as a "direct" or "indirect" purchaser turned on whether "an antecedent transaction between the monopolist and another, independent purchaser" absorbed or passed on all or part of the monopoly overcharge. *Id*. at 1169. Plaintiffs bought concert tickets directly from Ticketmaster, but the majority nevertheless concluded that plaintiffs were indirect purchasers who lacked standing under *Illinois Brick*. *Id.* at 1171. Using an analysis keyed to the "antecedent transaction," the majority concluded that the ticket buyers were indirect purchasers.

We disagree with the majority's analysis in *Ticketmaster*. As Judge Morris Arnold pointed out in dissent, the majority's "antecedent transaction" analysis has no basis in Supreme Court precedent. *Id.* at 1174 (M. Arnold, J., dissenting). *Illinois Brick* held that where plaintiffs are in a "direct vertical chain of transactions" and an intermediary "pass[es] on" monopolistic overcharges originating further up the chain, subsequent buyers lack standing. *Id.* (internal quotation marks omitted). In *Ticketmaster*, "[t]he monopoly product at issue . . . is ticket distribution services, not tickets." *Id*. The distributor who "supplies the product directly to" plaintiffs, rather than the producer of the product, is the appropriate defendant in an antitrust suit. *Id.*

Apple argues that it does not sell apps but rather sells "software distribution services to developers." In Apple's view, because it sells distribution services to app developers, it cannot simultaneously be a distributor of apps to app purchasers. Apple analogizes its role to the role of an owner of a shopping mall that "leases physical space to various stores." Apple's analogy is unconvincing. In the case before us, third-party developers of iPhone apps do not have their own "stores." Indeed, part of the anti-competitive behavior

alleged by Plaintiffs is that, far from allowing iPhone app developers to sell through their own "stores," Apple specifically forbids them to do so, instead requiring them to sell iPhone apps only through Apple's App Store.

We do not address the question whether Apple sells distribution services to app developers within the meaning of *Illinois Brick*. If it did, this would necessarily imply that the developers, as direct purchasers of those services, could bring an antitrust suit against Apple. But whether app developers are direct purchasers of distribution services from Apple in the sense of *Illinois Brick* makes no difference to our analysis in the case now before us.

We do not rest our analysis on the fact that Plaintiffs pay the App Store, which then forwards the payment to the app developers, less Apple's thirty percent commission. Whether a purchase is direct or indirect does not turn on the formalities of payment or bookkeeping arrangements. *See Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1146 (9th Cir. 2003). If Plaintiffs were direct purchasers from Apple solely because Apple collected their payments, Apple could escape anti-trust liability simply by tinkering with the order in which digital banking data zips through cyberspace during a sales transaction.

Nor do we rest our analysis on the form of the payment Apple receives in return for distributing iPhone apps. Apple does not take ownership of the apps and then sell them to buyers after adding a markup of thirty percent. Rather, it sells the apps and adds a thirty percent commission. But the distinction between a markup and a commission is immaterial. The key to the analysis is the function Apple

serves rather than the manner in which it receives compensation for performing that function.

Nor, finally, do we rest our analysis on who determines the ultimate price paid by the buyer of an iPhone app. In the case before us, the price is determined as a practical matter by the app developer who sets a price, to which Apple's thirty percent commission is added automatically. Our opinion in *Delaware Valley* makes clear that this does not make app purchasers direct buyers from the app developers. In *Delaware Valley*, the price paid by the distributor, O & M, to the manufacturer, J & J, was determined through a negotiation between J & J and a GPO of which Bamberg was a member. Despite the fact that Bamberg, through its GPO, had a say in the wholesale price charged by J & J to O & M, to which the distributor added its predetermined markup, we held that Bamberg was a direct purchaser from O & M. Here, the case is even stronger in favor of Plaintiffs. Unlike Bamberg, Plaintiffs have no say whatsoever in determining the price set by the app developer to which the distributor adds its predetermined commission.

Instead, we rest our analysis, as compelled by *Hanover Shoe*, *Illinois Brick*, *UtiliCorp*, and *Delaware Valley*, on the fundamental distinction between a manufacturer or producer, on the one hand, and a distributor, on the other. Apple is a distributor of the iPhone apps, selling them directly to purchasers through its App Store. Because Apple is a distributor, Plaintiffs have standing under *Illinois Brick* to sue Apple for allegedly monopolizing and attempting to monopolize the sale of iPhone apps.

Conclusion

We conclude that any error, if indeed there was error, in the district court's consideration of the merits of Apple's Rule 12(b)(6) motion to dismiss for lack of statutory standing was harmless. We conclude further that Plaintiffs are direct purchasers of iPhone apps from Apple under *Illinois Brick* and that they therefore have standing to sue. The district court dismissed Plaintiffs' complaint on the ground that they lacked statutory standing under *Illinois Brick*. We therefore reverse and remand for further proceedings.

**REVERSED and REMANDED.**